UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

EDWIN D. CALLIGAN,

    Petitioner,

        v.                       CAUSE NO. 3:21-CV-68-MGG

WARDEN,

    Respondent.

OPINION AND ORDER

Edwin D. Calligan filed a habeas petition under 28 U.S.C. § 2254 to challenge his conviction for unlawful possession of a handgun under Case No. 02D04-1603-F4-28. Following a jury trial, on December 20, 2017, the Allen Superior Court sentenced him as a serious violent felon to ten years of incarceration. In the habeas petition, Calligan argues that he is entitled to habeas relief because law enforcement did not have a valid basis to initiate the traffic stop or to initiate the search of his vehicle.

The Warden, by counsel, responds that Calligan cannot obtain habeas relief on the basis of an unlawful stop or search because he had a full and fair opportunity to litigate his Fourth Amendment claim in State court. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). This is because the exclusionary rule, which requires the suppression of evidence obtained in violation of the Fourth Amendment, is not a

"personal constitutional right" of the accused; rather, "it is a judicially created means of effectuating the rights secured by the Fourth Amendment." *Brock v. United States*, 573 F.3d 497, 499 (7th Cir. 2009). Therefore, federal habeas courts are barred from reviewing free-standing Fourth Amendment claims that were fully and fairly litigated in state court. *Id.* at 494-95; *Monroe v. Davis*, 712 F.3d 1106 (7th Cir. 2013).

"A petitioner has had the benefit of such an opportunity so long as (1) he clearly apprised the state court of his Fourth Amendment claim along with the factual basis for that claim, (2) the state court carefully and thoroughly analyzed the facts, and (3) the court applied the proper constitutional case law to those facts." *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005); *Hampton v. Wyant*, 296 F.3d 560, 563 (7th Cir. 2002). In plain terms, "[i]t is the right to have a judge who has not closed his mind to the issues, is not bribed or sleepwalking, and is not in some other obvious way subverting the hearing." *Brock*, 573 F.3d at 501. A federal habeas court's task is not to "second-guess the state court on the merits of the petitioner's claim, but rather to assure [itself] that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe*, 712 F.3d at 1114.

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence as follows:

> In the early morning hours of March 25, 2016, Fort Wayne Police Department Detectives Marc Deshaies ("Detective Deshaies") and Tim Hughes ("Detective Hughes"), who were affiliated with the Gang and

2

Violent Crime Unit, were working in a high-crime area near Foster's Bar and Grill ("Foster's"). Specifically, the area is known for problems with drug trafficking, violence and fights, and shots-fired incidents. At approximately 2:30 a.m., the detectives observed a group of people in a nearby parking lot that were involved in a loud, heated argument, which appeared to be on the verge of turning into a physical altercation. The individuals involved in the argument got into three different vehicles and drove off together in a processional line. The lead vehicle was a Dodge Charger ("the Charger"), which was followed by a Chevrolet Impala ("the Impala") and an Infinity ("the Infinity").

Detectives Deshaies and Hughes followed the vehicles, which accelerated quickly. The detectives noticed that the Charger was repeatedly swerving within its lane, and, at one point, almost struck the curb. The Charger subsequently came to a complete and sudden stop in the middle of an intersection before continuing through the intersection. Detective Deshaies, who had been trained to "pace" a vehicle to determine its speed, "paced" the cars, all of which frequently exceeded the thirty-five-mile-per-hour speed limit. After the Infinity turned off onto a side street, the driver of the Impala appeared to be trying to prevent the officers from moving between it and the Charger.

Concerned that the driver of the Charger was impaired, the detectives initiated a traffic stop in a residential area after managing to maneuver behind the Charger. The driver of the Charger slowed down but continued to move forward for thirty to forty feet. As the detectives walked toward the stopped Charger, it began to roll forward again. As the detectives were yelling for the car to be put in park, Calligan, the driver, leaned out the window and responded that the Charger had stopped even though the car was continuing to roll forward. When the Charger came to a complete stop, the detectives noticed two passengers and movement in the vehicle. Other officers who had heard radio communications about the Charger's initial failure to stop immediately began arriving on the scene.

As Detective Deshaies approached the Charger and began to speak with Calligan, the detective immediately smelled the odor of alcohol emanating from Calligan. Further, Calligan's speech was slurred, his eyes were bloodshot, and he fumbled through his wallet attempting to find his insurance card.
Concerned that Calligan might attempt to drive off again, Detective Deshaies asked Calligan for the keys to the car several times. Calligan refused to comply with the detective's request and was "incredibly argumentative." He subsequently removed the keys from the ignition,

3

refused to hand them to Detective Deshaies, and dropped them in the center console.

While Detective Deshaies was speaking with Calligan, other officers approached the front-seat passenger, who identified himself by a name that the officers immediately knew to be false. This passenger eventually had to be forcibly removed from the car after he refused to get out of the vehicle when the officers asked him to do so. An on-scene fingerprint identification revealed that the passenger had an active warrant for failing to appear in a gun case. At the same time, several females who had been in the Impala returned to the scene on foot and were loudly challenging the officers' actions and had to be physically restrained from interfering with the ongoing traffic stop.

As Detective Deshaies was checking Calligan's information, other officers asked Calligan and the rear-seat passenger to exit the car and sit on the curb a few feet behind the Charger. The men were not handcuffed. Fort Wayne Police Department Sergeant Gary Hensler ("Sergeant Hensler") searched the interior of the Charger for the purpose of officer safety and found a loaded handgun between the driver's seat and the center console. Detective Hensler then handcuffed Calligan and the rear-seat passenger.

The State charged Calligan with Level 4 felony unlawful possession of a firearm by a serious violent felon; Class A misdemeanor unlawful possession of a firearm by a domestic batterer, and Class A misdemeanor operating while intoxicated. Calligan filed a motion to suppress. At the suppression hearing, Sergeant Hensler responded as follows when asked why he had searched the car: "Well for all the reasons we already had, um, extended period of time to pull over, starting and stopping, fear of them retrieving a weapon, hiding contraband, formulating a plan, uh, the front seat passenger showing deception." Following the hearing, the trial court denied Calligan's motion to suppress. Before trial, the State dismissed the misdemeanor counts.

Calligan objected to the admission of the gun at trial. Also at trial, Detective Deshaies testified that he and Detective Hughes were concerned when Calligan's car kept rolling at the time of the stop. According to Detective Deshaies, "[t]ypically when we see these . . . stops that take a very long time to stop in my experience and training[,] it's because people are either trying to secret or access contraband or weapons in the car prior to being stopped." Sergeant Hensler testified that he had searched the vehicle for officer safety because: (1) the Charger did not stop immediately, which suggested that the vehicle's occupants might have

4

>been attempting to hide weapons or drugs; (2) the traffic stop occurred in a high crime area where there were many drug transactions and shootings; and (3) the women from the Impala were very upset over the traffic stop and could have distracted the officers or assisted the men in the Charger with committing a crime, including assaulting the officers.
>
>Fort Wayne Police Department Detective Matthew Foote ("Detective Foote") had also been conducting surveillance in the area of Foster's. According to Detective Foote, police officers had been called to Foster's for shootings, stabbings, and fights, and there had been a killing there the previous month. When he arrived at the scene of the traffic stop, Detective Foote was concerned when the front-seat passenger gave a name that the officers knew was not his. Detective Foote further explained that "often times when somebody supplies us with a false name[,] it's to cover up criminal activity. Often times they are fugitives from justice, and that's what it ended up being in this case."

ECF 8-6 at 2-5; *Calligan v. State*, 123 N.E.3d 724 (Ind. App. 2019).

On direct appeal, the Indiana Court of Appeals first considered the validity of the initial traffic stop. ECF 8-6. The appellate court applied *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and found that law enforcement had reasonable suspicion to suspect that Calligan exceeded the thirty-five miles per hour speed limit and that he had operated a vehicle while intoxicated. *Id.* The appellate court relied on law enforcement's ability to gauge vehicular speed through "pacing" and their testimony that they saw the vehicle swerve and stop in the middle of an intersection. *Id.* Accepting the State court's factual findings as correct, as the court must on habeas review, the State court correctly determined that law enforcement had a valid basis to initiate a traffic stop. *See U.S. v. Reaves*, 796 F.3d 738, 741 (7th Cir. 2015) ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated.").

5

Calligan challenges the ability of law enforcement to accurately gauge his speed through "pacing" as unreliable, and he maintains that use of this practice could not provide a valid basis to initiate a traffic stop or an arrest. The record demonstrates the State court made a credibility determination on law enforcement's testimony on "pacing" after considering Calligan's contrary argument. ECF 8-6 at 9 n.2. Though Calligan may have legitimate concerns about the reliability of "pacing," these concerns do not persuade that the State court's credibility determination was tantamount to intellectual dishonesty or a failure to engage with the relevant facts.

Calligan argues that the State court erred by finding that the search of the vehicle was reasonable under *Michigan v. Long*, 463 U.S. 1032 (1983). In *Long*, the Supreme Court of the United States held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1048.

The Indiana Court of Appeals applied *Long* and found that law enforcement had a reasonable basis to suspect that Calligan was dangerous due to the delayed nature of the stop, which suggested to law enforcement that Calligan intended to flee or was attempting to either access or conceal a weapon. ECF 8-6. The appellate court also observed Calligan's argumentative nature, his intoxication, and his reluctance to cooperate with law enforcement and that Calligan's passenger gave law enforcement a

6

false name, had an arrest warrant for a "gun case," and had to be forcibly removed from the vehicle. *Id.* The appellate court further found that Calligan could have gained immediate control over a weapon in the passenger compartment given that the two men were not handcuffed and were seated on a curb a few feet from the vehicle. *Id.*

Calligan maintains that the Indiana Court of Appeals erred in finding that the circumstances satisfied *Long* because they had no basis to believe that he was dangerous, because he was not within "reaching distance" of the area between the driver's seat and the middle console at the time of the search, and because law enforcement had already decided to arrest him and to not allow him to return to his vehicle. However, the record contained evidence of Calligan's behavior before and during traffic stop as well as law enforcement's testimony regarding their safety concerns. Motion Hearing Tr. 5-107. Further, the *Long* analysis does not focus on whether an area is within a suspect's immediate reach as the search is ongoing, and *Long* does not suggest that law enforcement are prohibited from removing occupants from a vehicle prior to conducting a protective sweep. Additionally, the record contains conflicting evidence as to when law enforcement decided to arrest him. According to the law enforcement's testimony, Calligan was not placed under arrest until after the search revealed a handgun, and the State courts were entitled to credit that testimony. Motion Hearing Tr. 35-38, 106. The court cannot conclude that the State court's finding that the circumstances satisfied *Long* amounted to intellectual dishonesty or otherwise deprived Calligan of a full and fair hearing on his challenge to the search of his vehicle.

7

Finally, Calligan argues that the State court engaged in intellectual dishonesty by applying *Long* rather than *Arizona v. Gant*, 556 U.S. 332 (2009). In *Gant*, the Supreme Court of the United States held that "police [may] search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" and "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009). Significantly, *Gant* applies to this case only if Calligan was under arrest at the time of the search, but the record indicates that the State court credited law enforcement's testimony regarding the timing of the arrest. Specifically, on appeal, the Indiana Court of Appeals applied *Long* only after expressly conveying its understanding that *Long* applied to cases in which " a full custodial arrest has not been effected." ECF 8-6 at 12. Moreover, the appellate court never referred to Calligan as being under arrest but instead cited *U.S. v. Arnold*, 388 F.3d 237 (7th Cir. 2004), as the sole analogous case for the vehicle search analysis and expressly noted that the criminal defendant in *Arnold* was not arrested at the time of his search. *Id.* at 13.

In sum, the State courts' reliance on *Long* rather than *Gant* was appropriate given the finding that Calligan was not under arrest at the time of search and given that the record contained sufficient evidence to support that finding. Calligan thus cannot demonstrate that the State courts' reliance on *Long* deprived him of a full and fair opportunity to litigate his claims. Therefore, the claim that Calligan was subjected to an unlawful search and seizure is not a basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Calligan to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on December 7, 2021

s/ Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge

9